UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ANDREW BRITT,

                     Plaintiff,                1:10-CV-168

          v.

GENERAL STAR INDEMNITY COMPANY,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                   OF COUNSEL:

FLINK SMITH LLC              EDWARD FLINK, ESQ.
Attorneys for Plaintiff          PAUL J. CAMPITO, ESQ.
23 British American Boulevard
Latham, New York 12110

MARSHALL, CONWAY, WRIGHT      CHRISTOPHER T. BRADLEY, ESQ.
& BRADLEY P.C.               MICHAEL S. GOLLUB, ESQ.
Attorneys for Defendant
116 John Street
New York, New York 10038

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

      Plaintiff Andrew Britt ("plaintiff" or "Britt") brought this suit against General Star

Indemnity Company ("defendant" or "General Star") to collect payment of an unsatisfied

judgment pursuant to New York State Insurance Law section 3420.  See N.Y. Ins. Law §

3420 (McKinney 2011).  Defendant filed an answer to plaintiff's complaint with a cross-claim

seeking a declaration that it has no duty to pay the judgment.

Plaintiff now moves for summary judgment to collect payment of $2,402,962.45 plus interest from November 17, 2009, and defendant opposes.  In opposition, non-movant General Star also urges the grant of summary judgment to it <u>sua sponte</u>, in the absence of a formal cross-motion.  The motion was considered on its submissions without oral argument.

## II.  BACKGROUND

The following facts are undisputed unless otherwise noted.  In February 2001 General Star issued a commercial umbrella insurance policy to Pharmacologic, Ltd.[1] ("Pharmacologic").  The policy had an aggregate limit of $3,000,000.[2]  <u>See</u> Flink Affirm., Ex. 6, Dkt. No. 15-9, 3.  As it related to coverage for bodily injury and property damage liability, the General Star policy stated: "We will pay on behalf of the insured for the ultimate net loss in excess of the <u>retained limit</u> because of bodily injury or property damage to which this policy applies."  <u>Id</u>. at 5 (emphasis added).  The "retained limit" was defined as the greater of:

   a.    That sum of amounts applicable to any claim or suit:
       (1)    From underlying insurance, whether such underlying insurance is collectible or not;
       (2)    From underlying insurance, which are not payable due to the reduction or exhaustion of the aggregate limits of such underlying insurance because of:
          (a) Bodily injury or property damage which occurred; and
          (b) Offenses which took place;
          either before the effective date or after the expiration date of this policy; and
       (3)    From other insurance; whether primary, excess, contingent or on any other basis, except such insurance as is specifically purchased to apply in excess of this policy's Limit Of Insurance; or
   b.    The self-insured retention.

---

[1] Pharmacologic P.E.T. Services, LLC was also a named insured under the policy.

[2] The General Star policy also contained a self-insured retention of $10,000 for "each occurrence or offense not covered by Underlying Insurance." <u>Id</u>.  However neither party suggests the self-insured retention is applicable in the instant case.

Id. at 22.  The policy defined "underlying insurance" as "the coverage(s) afforded under insurance policies, for the limits shown, as designated in the SCHEDULE OF UNDERLYING INSURANCE and any renewals or replacements of those policies."  Id. at 23.

The "Schedule of Underlying Insurance" included four insurance policies with the following relevant limits: 1) a Commercial General Liability ("CGL") policy issued by St. Paul Insurance Company ("St Paul") with limits of $1,000,000 for each occurrence of bodily injury/and or property damage liability combined and $2,000,000 for the general aggregate; 2) a Professional Liability policy issued by St. Paul with limits of $1,000,000 for each occurrence of bodily injury/and or property damage liability combined and $3,000,000 aggregate; 3) an Automobile Liability policy issued by Commercial Union Insurance Company with a limit of $500,000 per occurrence of bodily injury and/or property damage liability combined[3]; and 4) an Employers Liability policy issued by Guard Insurance Company with $1,000,000 limits each for bodily injury due to accident or disease.  Id. at 4.

The General Star umbrella policy defined an "Insured," in part, as follows:

SECTION III
Who Is An Insured . . .
3.      With respect to any (i) auto, or (ii) mobile equipment, provided such
        mobile equipment is registered in your name under any motor vehicle
        registration law; any person is an insured while driving such auto or
        mobile equipment with your permission.

Id. at 12-13.  The parties do not dispute that the "Umbrella policy required underlying automobile insurance with a $500,000 limit" which Pharmacologic maintained at the time in

---

[3] Although the General Star policy submitted by plaintiff indicates that the automobile liability policy was through Commercial Union Insurance Company, the parties' submissions entirely relate to an automobile liability policy issued by The Hartford Insurance Company ("The Hartford").  While it is not clear, The Hartford policy presumably replaced the Commercial Union Insurance Company policy.

question through The Hartford.  See Pl.'s Statement of Material Facts ("SMF"), Dkt. No. 15-31, ¶¶ 4, 6.  The relevant portion of The Hartford policy defined an "Insured" as follows:

> 1.    WHO IS AN INSURED
> The following are "insureds":
> a.  You for any covered "auto."
> b.  Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

See Flink Affirm., Ex. 5, Dkt. No. 15-8, 42.

At the time of the events giving rise to this litigation, Dennis Bridges ("Bridges") was employed by Pharmacologic.  On September 21, 2001, he was operating a 2000 Chevy Astro van (the "van") owned by Pharmacologic.  At nearly midnight that day, after using the van extensively for personal and, at times, illegal purposes, Bridges collided with a police cruiser operated by plaintiff, who was acting in the course of his employment as a police officer for the City of Albany.  Plaintiff sustained serious personal injuries in the collision.  Following these events, Bridges was charged with and convicted of assault, reckless endangerment, and criminal possession of stolen property.  He is currently serving 25 years to life in state prison.

On October 2, 2002, plaintiff Britt and his wife Angela Britt[4] commenced an action against Pharmacologic and Bridges in Albany County Supreme Court.  The lawsuit sought damages for personal injuries as a result of the negligence of Bridges and Pharmacologic.  Bridges was served with the summons and complaint in the action on November 15, 2002.  General Star received a copy of the summons and complaint on November 27, 2002.

---

[4] While both Andrew and Angela Britt were plaintiffs in the underlying personal injury action, all references to "plaintiff" herein are to Andrew Britt, the only plaintiff in the instant federal court action.

By letter to Bridges dated November 14, 2002, The Hartford disclaimed coverage for any claims arising from the September 21, 2001, collision because Bridges was not an insured under the terms of The Hartford policy.  See Flink Affirm., Ex. 8, Dkt. No. 15-11.  The letter informed Bridges that The Hartford's investigation revealed he did not have permission to operate the van at the time of the incident and therefore was not covered under the policy.  The Hartford copied the disclaimer letter to plaintiff's attorneys, Flink Smith LLC.  General Star also received a copy of The Hartford disclaimer letter on December 2, 2003.

On February 25, 2004, General Star issued a letter to Bridges acknowledging receipt of the summons and complaint in the underlying personal injury action and receipt of The Hartford's denial letter.  See Flink Affirm., Ex. 9, Dkt. No. 15-12.  The letter stated that The Hartford's investigation revealed Bridges did not have permission to use the vehicle that was involved in the automobile collision.  General Star referenced the relevant provisions in its umbrella policy noting that "[t]he policy indicates that one is considered an insured while operating an auto with permission of the insured."  Id.  The letter concluded that General Star would not provide coverage for the collision with plaintiff.  The parties dispute the nature of the letter, which plaintiff characterizes as a disclaimer and defendant merely refers to as a letter.  It is undisputed that the General Star letter was not served on plaintiff or his attorneys.

Pharmacologic moved for summary judgment in the underlying the personal injury action on the grounds that Bridges did not have permission to use the company van at the time of the incident, that it is not vicariously liable for the intentional torts of a person driving its vehicle, and that it did not negligently hire Bridges.  On September 23, 2005, Albany County Supreme Court Judge Thomas J. McNamara issued a Decision and Order, dismissing the "portions of the complaint seeking recovery based upon [New York] Vehicle

and Traffic Law § 388." Britt v. Pharmacologic Pet Servs, Inc., No. 7092-02, 2005 WL 6214678 (N.Y. Sup. Ct. Albany Cnty. Sept. 23, 2005); Flink Affirm., Ex. 10, Dkt. No. 15-13. Section 388 renders an owner liable for damages caused by the negligence of anyone using the owner's motor vehicle with permission.  N.Y. Veh. & Traf. § 388 (McKinney 2011).  It also creates a presumption that use is permissive; however, it does not impose liability for intentional torts.  The court found that Pharmacologic made a prima facie showing that Bridges did not have permission to use the company van at the time of the incident, based on the undisputed testimony of Pharmacologic's vice president and manager that the company did not allow employees to use company vans for personal use.[5]  The court denied summary judgment on the remaining two grounds.

On appeal, the New York Appellate Division Third Department affirmed Judge McNamara's decision, stating that "plaintiffs failed to raise a material question of fact as to whether Bridges's operation of the minivan exceeded the time, place and purpose of the use permitted by PPS [Pharmacologic].  Accordingly, we find no error in Supreme Court's determination." Britt v. Pharmacologic Pet Servs., Inc., 36 A.D.3d 1039, 1041 (N.Y. App. Div. 3d Dep't Jan. 11, 2007) (internal citations omitted).  The New York State Court of Appeals dismissed plaintiffs' motion for leave to appeal on the ground that the order sought to be appealed from did not finally determine the action within the meaning of the New York State Constitution. See Britt v. Pharmacologic Pet Servs., Inc., 9 N.Y.3d 831 (2007).

The personal injury action was eventually tried before a jury in Albany County Supreme Court during February 2008.  Bridges never appeared in the action and liability

---

[5] There was testimony that employees were sometimes allowed to use the vans to drive to or from their homes; however, Bridges stated in his deposition that he was using the van for personal use to carry other people for hire, and was aware that such use was not permitted.

against him was found as a matter of law by the Albany County Supreme Court in a directed verdict.  See Flink Affirm., Ex. 12, Dkt. No. 15-15, 2.  On February 19, 2008, the jury reached a verdict, finding that Pharmacologic had negligently hired Bridges and negligently entrusted the van to him, and that Pharmacologic's negligence was a substantial factor in causing Britt's injuries.  The jury awarded $3,162,860.63 to Britt.[6]

Subsequent to the jury verdict, Pharmacologic made several post-trial motions including one to set aside the jury verdict and/or reduce the amount of the award.  On October 21, 2008, Albany County Supreme Court Judge Kimberly A. O'Connor rendered a Decision and Order (the "remittitur") reducing the award in the amount of $792,249 based on plaintiff's failure to prove those amounts of damage.  See Flink Affirm., Ex. 12.  The Decision and Order vacated the award of $42,249 for loss of future household services and reduced the verdict from $500,000 to $250,000 for past pain and suffering and from $1,000,000 to $500,000 for future pain and suffering.  Id.

Britt contends that the remittitur related solely to Pharmacologic while General Star maintains that it reduced the overall award irrespective of any particularly defendant's liability.  On December 1, 2008, plaintiff stipulated to the reduced award as set forth in the October 21, 2008, remittitur and filed the stipulation the following day.  See Flink Reply Affirm., Ex. 13a, Dkt. No. 20-1.  On December 10, 2008, Pharmacologic filed a Notice of Appeal from the October 21, 2008, Decision and Order.  See Flink Affirm., Ex. 14, Dkt. No. 15-17.

---

[6] The jury did not award damages to plaintiff Angela Britt on her derivative claim.

Following these events, plaintiff's counsel submitted to Judge O'Connor a proposed order directing entry of a judgment against Bridges, for the full amount of the jury verdict, pursuant to New York Civil Practice Law and Rules Article 50-B ("50-B").  Plaintiff argued that the 50-B judgment was appropriately in the full amount of the jury verdict, prior to the reductions directed in the October 21, 2008, remittitur, "[s]ince [they] do not believe that Dennis Bridges is entitled to the benefit of the motion of Pharmacologic . . . ."  See Flink Affirm., Ex. 15, Dkt. No. 15-18.  By letter to Judge O'Connor, counsel for Pharmacologic objected to the proposed order seeking judgment for the full verdict amount.  See Flink Affirm., Ex. 16, Dkt. No. 15-19.  Pharmacologic argued, inter alia, that there should not be two separate judgments against Pharmacologic and Bridges based on the same underlying events because there was no apportionment of liability between the two defendants.  They maintained that to enter a judgment against Bridges based on the original verdict, even though he defaulted, would conflict with the October 21, 2008, remittitur and the plaintiffs' December 1, 2008, stipulation to those reductions.

On July 24, 2009, while Pharmacologic's appeal was pending, plaintiff reached a settlement with Pharmacologic for $1,200,000 relating to the negligent entrustment and negligent hiring claims rendered against them.  Of that settlement, The Hartford, pursuant to the aforementioned commercial automobile policy and the negligent entrustment claim, paid its policy limit of $500,000.  The remainder of the settlement, $700,000, was paid directly by Pharmacologic.[7]  By letter dated August 12, 2009, plaintiff advised Judge O'Connor of the

---

[7] Defendant asserts in its Memorandum of Law ("MOL") that the underlying action was tendered to The Hartford and St. Paul, and St. Paul refused to contribute.  The record is devoid of evidence relating to this and it is unclear if a claim was filed with St. Paul and under what, if any, circumstances St. Paul denied coverage or disclaimed liability.  This information is relevant to the discussion below

(continued...)

settlement with Pharmacologic and re-submitted the proposed order directing entry of the 50-B judgment against Bridges for the full amount of the jury verdict, before reduction.  See Flink Affirm., Ex. 21, Dkt. No. 15-24.  On September 11, 2009, Judge O'Connor signed an Order directing entry of the judgment against Bridges in the amount of $3,162,860.63 pursuant to 50-B.  See Flink Affirm., Ex. 22, Dkt. No. 15-25.  The Order and Notice of Entry of the 50-B judgment was served on Bridges at the Greenhaven Correctional Facility on September 28, 2009.  On November 17, 2009, a Judgment and Bill of Costs were filed against Bridges, and served on him on November 19, 2009.  See Flink Affirm., Ex. 23, Dkt. No. 15-26.  Plaintiff served the Judgment and Bill of Costs via certified mail on General Star.  On November 17, 2009, plaintiff contacted General Star and demanded payment of $2,402,962.45, the outstanding judgment with costs, less settlement amounts received from The Hartford and Pharmacologic, and threatened legal action if that amount was not paid within 30 days.  The demand has since remained unsatisfied for more than 30 days.

General Star now asserts that plaintiff's August 12, 2009, letter to Judge O'Connor failed to advise her of the October 21, 2008, remittitur for future household services and past and future pain and suffering in a total reduction amount of $792,249, as well as plaintiffs' December 1, 2008, stipulation accepting those reductions.  As a result, they contend that the September 11, 2009, Order directing entry of judgment, the Notice of Entry of judgment, and the Judgment, all failed to account for the reduction of $792,249.  Therefore, General Star argues that the outstanding judgment plaintiff now seeks fails to account for that reduction.

---

[7](...continued)
regarding exhaustion of the retained limit.  See Def.'s MOL, Dkt. No. 17, 21.

On January 15, 2010, plaintiff commenced this action against General Star pursuant to New York State Insurance Law section 3420. On February 11, 2010, General Star removed the action to federal court and interposed an answer and cross-claim. The cross-claim asserts that Bridges was not an insured under the General Star policy, by lack of inclusion, based upon the findings of the Supreme Court Albany County and the Appellate Division Third Department that Bridges did not have permission to operate the van at the time of the incident.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986). All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

After the moving party has satisfied its burden, the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial. Fed. R. Civ. P. 56; Liberty Lobby, Inc., 477 U.S. at 250, 106 S. Ct. at 2511. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356. There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party.

Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

**B.  New York Insurance Law Section 3420**

General Star first argues that section 3420 is inapplicable because the underlying judgment against Bridges is unenforceable as a matter of law.  Defendant also contends that it had no duty to disclaim under section 3420(d)(2)[8] because the General Star policy only attached in excess of the retained limit, and the retained limit was not exhausted. Alternatively, even if the state court judgment against Bridges is enforceable and the General Star policy triggered, defendant argues that Bridges' collision was not covered by the General Star policy because he was not using the van with permission and was never included in the policy's coverage.  As Bridges' claim fell outside General Star's umbrella coverage, defendant submits that it did not issue a disclaimer to Bridges and had no duty to do so.

Britt maintains that the judgment against Bridges is presumed valid and binding and that all conditions in the General Star policy, including exhaustion of The Hartford's $500,000 policy, were met to trigger coverage.  Plaintiff argues that General Star's denial of coverage was based on an exclusion – that Bridges was driving the vehicle without permission and therefore a disclaimer was required under section 3420(d)(2).  He submits that General Star's February 25, 2004, letter to Bridges was a written notice of disclaimer but that it was ineffective because it was untimely and never served on plaintiff.

New York Insurance Law section 3420 grants an injured party the right to sue a tortfeasor's insurance company when the following conditions are met: the injured party must

---

[8] The text was amended in 2008 but the changes do not affect the instant case.

obtain a judgment against the tortfeasor; the injured party must serve the judgment on the tortfeasor and the insurer; and the judgment must remain unsatisfied for 30 days.  See e.g., Lang v. Hanover Ins. Co., 3 N.Y.3d 350, 354 (2004).  "Once the statutory prerequisites are met, the injured party steps into the shoes of the tortfeasor and can assert any right of the tortfeasor-insured against the insurance company."  Id. at 355.

### 1. Judgment Against Bridges

At the outset, defendant challenges the judgment obtained against Bridges and contends it must be ignored pursuant to Federal Rule of Civil Procedure 60(b).  Rule 60(b) provides, inter alia, that on motion a court may set aside a final judgment obtained by mistake, inadvertence, surprise, excusable neglect, fraud, or any other reason that justifies relief.  Defendant argues the judgment is unenforceable as a matter of law because it does not account for the $792,249 reduction set forth in Judge O'Connor's October 21, 2008, Decision and Order and stipulated to by the Britts.  General Star contends that "Plaintiff failed to advise both the Supreme Court and this Court" about the reduction, and "whether it be mistake, inadvertence, excusable neglect, or fraud is irrelevant.  The Judgment is fundamentally incorrect."  Def.'s Mem. of Law, Dkt. No. 17, 23.  Plaintiff maintains that the $792,249 remittitur applied only to the award against Pharmacologic and that the 50-B judgment was entered properly against Bridges in the full amount of the jury verdict.  Notably, Judge O'Connor's Decision and Order stated that "[t]he issues raised in the motions currently before this Court relate only to defendant Pharmacologic."  Flink Affirm., Ex. 12, 2.

The 50-B judgment entered against Bridges in Albany County Supreme Court is presumed valid.  The underlying personal injury action was presided over by Judge O'Connor, who decided Pharmacologic's post-trial motions, and thereafter issued post-trial

orders.  Upon submission by plaintiff's counsel of the proposed 50-B judgment to Judge

O'Connor, and over objection by Pharmacologic's counsel, she issued an Order directing

entry of the 50-B judgment against Bridges.  See Flink Affirm., Ex. 22.  That judgment was

then entered against Bridges, and served on Bridges and General Star, as noted above.  The

judgment was never challenged or appealed by Pharmacologic nor General Star.  There is

no need to examine in detail Judge O'Connor's October 21, 2008, Decision and Order

reducing the award upon Pharmacologic's motion.  Even if the amount of the 50-B judgment

was somehow incorrect, as defendant now contends, there is no jurisdiction to reverse or set

aside the properly issued judgment by the state court.

Nor does Rule 60(b) permit General Star to attack the judgment.  First, no motion has

been made by General Star as required by Rule 60(b).  Second, a motion under Rule 60(b)

must be made within a reasonable time, and when based on the above reasons such as

fraud, no more than a year after the entry of the judgment or order or the date of the

proceeding.  Fed. R. Civ. P. 60(c).  The judgment was filed against Bridges on November 17,

2009, and thus any motion pursuant to Rule 60(b) needed to be filed by November 17, 2010.

Third, Rule 60(b) permits federal courts to reexamine their own judgments on a claim of fraud

on the court.  General Star's reliance on Griffith v. Bank of New York, 147 F.2d 899 (2d Cir.

1945), to argue that federal courts may set aside state court judgments obtained by fraud is

less than persuasive.  In Griffith, the plaintiff was the party affected by a state court judgment

obtained under duress.  Here, General Star was not a party to the underlying state court

judgment.  Further, under the Rooker-Feldman doctrine, federal courts are precluded from

reviewing state court judgments except in limited circumstances.  See, e.g., McKithen v.

Brown, 626 F.3d 143, 154 (2d Cir. 2010).

General Star has no basis to collaterally attack plaintiff's validly obtained judgment against Bridges in state court and the judgment will not be altered.

## 2. <u>Exhaustion of Underlying Retained Limit</u>

The parties do not dispute that in order for the General Star umbrella policy to provide excess coverage, the retained limit must first be exhausted.  General Star contends that the retained limit was never met because St. Paul, the CGL carrier, refused to contribute $1,000,000.  Plaintiff contends that the claim in this matter is pursuant to General Star's excess coverage to the underlying automobile liability policy issued by The Hartford and the appropriate retained limit for a claim for automobile liability is the $500,000 limit stated in the Schedule of Underlying Insurance.  Therefore Britt argues any failure of St. Paul, the CGL carrier, to contribute is irrelevant because the CGL policy does not cover automobile accidents.

The critical issue concerns the meaning of "retained limit."  The General Star policy defined "retained limit" in part as "[t]hat sum of amounts applicable to any claim or suit . . . [f]rom underlying insurance, whether such underlying insurance is collectible or not."  Flink Affirm., Ex. 7, 22.  The "retained limit" policy definition clearly implicates the limits provided in the Schedule of Underlying Insurance.  The Schedule of Underlying Insurance included four distinct policies as described above.

Defendant's position is not entirely clear.  General Star notes that "this 'Schedule of Underlying Insurance' controls General Star's excess obligation" without indicating which specific policy or policies control.  <u>See</u> Def.'s MOL, 21.  It would be nonsensical to conclude that the limits of all four policies must be exhausted before General Star's umbrella coverage is triggered.  To accept this argument would allow General Star to avoid honoring any claim

under the umbrella policy since it may very well be impossible for one particular liability to simultaneously fall under all four policies.[9]

Logically then, defendant's argument must be that the retained limit is met only when the total of all policies in the Schedule of Underlying Insurance, which provide coverage to the liability at issue, are exhausted.  Under this theory, General Star's position is presumably that an automobile collision such as the one involving plaintiff invokes coverage of <u>both</u> the St. Paul CGL policy and The Hartford automobile liability policy.  Therefore the limits of both of those policies would need to be exhausted to reach the retained limit and trigger General Star's umbrella coverage.  Defendant's entire argument is premised on the assumption that the St. Paul policy is applicable to the instant automobile collision between Bridges and plaintiff and the subsequent finding of Bridges' negligence.

The definition of "retained limit" in the General Star policy is consistent with a finding that Pharmacologic must only exhaust the limit or limits in the Schedule of Underlying Insurance which apply to the liability at issue.  <u>See</u> Flink Affirm., Ex. 7, 22 ("That sum of amounts <u>applicable</u> to any claim or suit . . . .") (emphasis added).  The issue then is whether the St. Paul CGL policy is applicable to the automobile collision.  Neither party has submitted the St. Paul CGL policy.  Plaintiff asserts that the "[St. Paul Commercial] General Liability policy does not provide coverage for automobile accidents."  Pl.'s Reply MOL, Dkt. No. 21, 7.

---

[9] For example, a customer may slip and fall and become seriously injured due to a wet floor on Pharmacologic's premises.  Such an incident may expose Pharmacologic, the insured, to liability. Without the three additional policies listed in the Schedule of Underlying Insurance in evidence – the CGL, the Professional Liability, and the Employers Liability policies – it is impossible to know which, if any, of the policies this set of facts would be covered by.  However, it is clear from this hypothetical set of facts, which did not involve an automobile, that The Hartford Automobile Liability policy would not provide coverage.  On these facts it would be impossible for the insured, or any injured claimant, to ever exhaust the limits of all four policies listed in the Schedule of Underlying Insurance.

He submits that the General Star policy "required that Pharmacologic maintain underlying automobile insurance in the amount of $500,000, and provided that the General Star policy would be triggered once the underlying policy was exhausted." Pl.'s MOL, Dkt. No. 15-32, 6.

The parties do not dispute that the "[u]mbrella policy required underlying automobile insurance with a $500,000 limit" which Pharmacologic maintained at the time in question through The Hartford. Pl.'s SMF, ¶¶ 4, 6. Further, General Star's February 25, 2004, denial letter stated in part: "We also acknowledge receipt on 12/2/03 of a denial of coverage letter dated 11/14/02 which was issued by Hartford, the <u>primary insurer</u> for Pharmacologic." Flink Affirm., Ex. 10, 1 (emphasis added). The Hartford policy provided that "[f]or any covered 'auto' you own, this Coverage Form provides <u>primary insurance</u>. For any covered 'auto' you don't own, the insurance provided . . . is excess over any other collectible insurance." <u>See</u> Flink Affirm., Ex. 6, 47 (emphasis added). The van Bridges was driving on September 21, 2001, was listed as a covered "auto" under The Hartford policy. Further, CGL policies typically exclude automobile liability, hence the need for an insured to obtain a separate commercial automobile liability policy, like Pharmacologic did through The Hartford. <u>See,</u> <u>e.g.</u>, 9A Couch on Insurance 3d § 129:30.

Notably, defendant never directly states that the St. Paul CGL policy provided coverage for the automobile collision. Instead, General Star focuses on St. Paul's refusal to contribute and quotes the General Star policy providing that the retained limit includes "underlying insurance, whether such underlying insurance is <u>collectible or not</u>." Flink Affirm., Ex. 7, 22. (emphasis added). Defendant makes the jump that St. Paul's refusal to contribute and the insured's inability to therefore <u>collect</u> on the policy renders it non-collectible. Then, relying on the above definition of the retained limit which includes underlying insurance

whether collectible or not, General Star concludes that the St. Paul policy limit must be included in calculating the retained limit despite the insured's ability to "collect" on it.

A "collectible" policy does not necessarily mean a policy which provides coverage, nor does it mean a policy on which an insurer makes payment on a claim.  Likewise, a "non-collectible" policy does not necessarily mean a policy which excludes coverage or one which an insurer refuses to make payment under.  Instead, generally the term "collectible" relates to the solvency or insolvency of an insurer.  See, e.g., Ambassador Assoc. v. Corcoran, 79 N.Y.2d 871 (1992).  Without knowledge of the facts pertaining to it, St. Paul's refusal to contribute does not alone render the St. Paul CGL policy non-collectible nor does it follow that its limit must be included in the General Star "retained limit" calculation.

Lastly, there is evidence suggesting that any involvement or applicability of the St. Paul policy related solely to the negligent hiring finding against Pharmacologic.  On June 12, 2009, preceding a settlement conference, plaintiff's attorney submitted a letter to Pharmacologic's attorney which discussed the General Star umbrella policy as it related to both the negligent entrustment and negligent hiring claims against Pharmacologic.  See Flink Reply Affirm., Ex. 29, Dkt. No. 20-5.  The letter noted that The Hartford's commitment of $500,000 under its automobile policy related to the finding of negligent entrustment against Pharmacologic.  The letter acknowledged that the St. Paul CGL policy may only be applicable to Pharmacologic's liability on the negligent hiring claim, but that there had not yet been a settlement with St. Paul.

To clarify, the jury in the underlying personal injury action found Pharmacologic guilty of negligent hiring and negligent entrustment and Bridges was found guilty of negligence.  Because the instant action under New York Insurance Law section 3420 is to enforce the 50-

B judgment rendered against Bridges for his negligent use of the van, any applicability of the St. Paul policy to Pharmacologic' liability on the negligent hiring claim is irrelevant.

Plaintiff has alleged enough facts to demonstrate that the appropriate retained limit applicable to the finding of negligence against Bridges, the subsequent 50-B judgment, and this claim under section 3420 was the $500,000 limit provided by The Hartford automobile liability policy.  The parties do not dispute that the General Star policy required an underlying automobile policy with a $500,000 limit, that Pharmacologic had such a policy, and that The Hartford tendered a check to plaintiff for $500,000.  General Star has not raised a triable issue of fact in opposition; instead defendant merely asserts that the General Star policy never attached because St. Paul refused to contribute $1,000,000.

In any event, even if this were a valid basis to deny coverage, General Star had a duty to issue a disclaimer that the retained limit was not met and has not done so.[10]  General Star's contention that it had no duty to disclaim coverage until the primary coverage had been exhausted is without merit.  Simply because defendant believed the retained limit had not been exhausted does not permit it to sit quietly.  An excess insurer's duty to disclaim is triggered when there is "a reasonable possibility that [its] excess coverage may be reached."  Kamyr, Inc. v. St. Paul Surplus Lines Ins. Co., 152 A.D.2d 62, 66-67 (N.Y. App. Div. 3d Dep't 1989).

It is clear that General Star was aware of the automobile collision and that Britt sustained serious personal injuries and damages which exceeded or could possibly exceed the limits of The Hartford policy and even the combined limits of The Hartford and the St.

---

[10] See below discussion of section 3420(d)(2) required written notice of disclaimer by insurer to insured and injured claimant.

Paul policies.  General Star received the summons and complaint in the underlying personal injury action on November 27, 2002.  While General Star was not a party in the underlying personal injury action, it clearly had knowledge of the proceedings.  See, e.g., Flink Affirm., Ex. 9.  At that point in time, there was a distinct possibility that the retained limit would be exhausted whether that was The Hartford's $500,000 policy limit as plaintiff contends, or a total of $1,500,000, The Hartford's $500,000 policy limit plus St. Paul's $1,000,000 limit, as defendant argues.  General Star never issued a disclaimer based on failure to exhaust the retained limit.  In fact, defendant maintains it had no duty to do so because the retained limit was never met.  It is now far too late to issue a disclaimer on this basis.  Accordingly, the retained limit was exhausted, triggering General Star's commercial umbrella policy.

### 3.  Section 3420(d)(2) Required Disclaimer

Because the judgment against Bridges is enforceable, section 3420 applies.  A liability insurer must give written notice "as soon as is reasonably possible" to the insured and the injured person or any other claimant of its intent to "disclaim liability or deny coverage." § 3420(d)(2).  The statute's purpose is to avoid prejudice to the insured, the injured claimant, and the Motor Vehicle Accident Indemnity Corporation, who could be harmed by delay in learning of the insurer's position.  NGM Ins. Co. v. Blakely Pumping, Inc., 593 F.3d 150, 153 (2d Cir. 2010).  It is well-settled that if the insurer fails to disclaim coverage in a timely or proper manner, it will be precluded from later successfully relying upon its defenses to coverage.  See Hartford Ins. Co. v. Cnty. of Nassau, 46 N.Y.2d 1028, 1029 (1979).

In the seminal case Zappone v. Home Insurance Co., the New York Court of Appeals interpreted the statute as requiring notice only when the denial of coverage is based on a policy exclusion, without which the claim would be covered.  55 N.Y.2d 131, 134 (1982).  By

contrast, a disclaimer is not required when a claim falls outside the scope of the policy's

coverage portion.  In that situation, the "policy does not contemplate coverage in the first

instance, and requiring payment of a claim upon failure to timely disclaim would create

coverage where it never existed."  Worcester Ins. Co. v. Bettenhauser, 95 N.Y.2d 185, 188

(2000).  Preliminarily then it must be decided whether the General Star policy provision

stating that "any person is an insured while driving such auto or mobile equipment with your

permission" is an exclusion, as plaintiff contends, or a prerequisite for inclusion, as defendant

contends.  Only if the provision is an exclusion does the adequacy of any alleged disclaimer

by General Star need to be examined.

"[D]rawing the line between a lack of coverage in the first instance (requiring no

disclaimer) and a lack of coverage based on an exclusion (requiring timely disclaimer) has at

times proved problematic"  Id. at 189.  General Star submits that because the policy is not a

primary automobile policy, but rather a commercial umbrella policy, it is written on an

inclusive basis.  They argue that the policy as written includes as an insured any person who

is driving an automobile with Pharmacologic's permission.  Because Bridges was not

operating the van with Pharmacologic's permission, they maintain he was not covered under

the policy and they had no duty to disclaim.

General Star cites to Zappone to argue that Bridges was never covered in the first

place.  55 N.Y.2d 131.  In Zappone, coverage was limited to "owned automobiles" and

"non-owned automobiles" listed under the two policies involved.  Id.  The vehicle at issue was

owned by one of the insured's but was not provided for under either policy and was driven by

the insured's brother at the time of the collision.[11]  Id. at 134-35.  The court concluded that to impose liability on the defendant insurance company, for a vehicle other than those covered under the policies, driven by someone other than the insureds, "would be to rewrite the policy to expose Home to a risk . . . never contemplated by the parties and for which Home had never been compensated."  Id. at 137-38.  Because there was no coverage in the first place, the defendant had no duty to timely disclaim.

General Star also cites the Second Circuit's recent decision in Blakely Pumping to support its position that there was no coverage "by reason of lack of inclusion."  593 F.3d at 154.  That case involved whether an automobile driven by the insured's executive officer was a covered automobile within the meaning of the policy.  The insurance company initially disclaimed coverage pursuant to the "exclusions" section of the policy which expressly disclaimed coverage for damages "arising out of the ownership, maintenance, use or entrustment to others of any . . . 'auto' . . . owned or operated by or rented or loaned to any insured."  Id. at 152.  An endorsement modified the policy by extending coverage to injuries arising from the use of a "hired auto"[12] or a "non-owned auto."[13]  Id.  After the endorsement provision was called to the insurer's attention, the insurer disclaimed again, this time because the driver was the insured's executive officer and, therefore, his vehicle was neither a "hired auto" nor a "non-owned auto."  Id.  The district court found that the endorsement "generally

---

[11] The vehicle involved in the collision was insured under a separate policy by Aetna Insurance Company.

[12] Defined as "any auto you lease, hire or borrow, not including any auto you lease, hire or borrow from any of your employees or members of their households, or from any partner or executive officer of yours."

[13] Defined as "any auto you do not own, lease, hire or borrow which is used in connection with your business."

covered auto accidents" and the definitions constituted exclusions of that general coverage. Id. The court then concluded that because the insurance company originally disclaimed based on the auto exclusion in the policy, it waived its right to later disclaim coverage based on the endorsement. Id. at 153.

On appeal, the Second Circuit reversed, concluding that the endorsement definitions did not constitute exclusions requiring a notice of disclaimer. They determined, contrary to the district court, that the endorsement "did not generally cover auto accidents; it covered only accidents arising from the use of a 'Hired Auto' or 'Non-Owned Auto.'" Id. at 154. Under those definitions, the executive officer's vehicle involved in the collision could never be covered. Id. The court distinguished the facts from Planet Insurance Co. v. Bright Bay Classic Vehicles, Inc., discussed below, "where the happening of a subsequent event implicated a definitional term that uncovered a formerly covered car." 75 N.Y.2d 394, 401 (1990) (internal quotations omitted). Instead, the court found the instant facts more analogous to Zappone where "the policy as written could not have covered the liability in question under any circumstances." 55 N.Y.2d at 134. The Second Circuit ultimately concluded that there was no coverage by reason of lack of inclusion and thus no notice of disclaimer was required by defendant NGM Insurance Company.

Britt contends that Greater New York Mutual Insurance Co. v. Clark controls. 205 A.D.2d 857 (N.Y. App. Div. 3d Dep't 1994). In that case, the insurance company argued it was not obligated to provide a notice of disclaimer because the policy did not provide coverage for non-permissive users. Id. at 858. Non-permissive use was not specifically denominated as an exclusion in the policy, but instead appeared in the definition of coverage. Id. The court concluded that "a careful reading of the limiting language used to

define who is an 'insured' under the policy reveals that non-permissive use is in the nature of an exclusion and, hence, a notice of disclaimer is required." Id.  The court noted that while it had not yet been proven that the vehicle at issue was used without permission, such a finding would negate coverage under the policy, but would not establish that there was no coverage in the first place.  Id. at 859.  The permissive use requirement simply operated as an exclusion, and a notice of disclaimer was required.

Britt also relies on Bright Bay.  75 N.Y.2d 394.  In Bright Bay, the court considered definitional language which did not appear in the "exclusions" section of the policy.  Planet Insurance Company insured Bright Bay's short-term car rental business.  The auto rental endorsement under which coverage was provided defined covered rental cars as those rented for periods of less than 12 months.  Id. at 398.  The vehicle at issue was involved in an accident while being rented for a 24 month period.  Id.  The court found that the definition's limiting language amounted to an exclusion and a notice of disclaimer was required.  Id. at 400.  The court noted that when rented, the vehicle was covered as part of the fleet of rental cars and it was not disputed that the insurer received a premium based on that car being a part of the fleet.  Id. at 401.  The vehicle was originally covered under the fleet policy but "became 'uncovered' upon the happening of a subsequent event: i.e., the rental of Bright Bay's car for a lease period other than that prescribed in the policy.  Thus, it cannot be said that there was never a policy in effect covering the involved automobile as in Zappone." Id.

It is undisputed that Bridges was an employee of Pharmacologic on the day of the collision and that the van had been entrusted to him earlier that day for his use as an employee and for some degree of personal use, such as driving home.  Because it was

determined in the state court proceedings that the van was entrusted to Bridges, he

necessarily had Pharmacologic's initial permission to drive the van.  The only issue was the

time period of the permissive use.  Plaintiff concedes that Judge McNamara decided that

Bridges' permission ended at some point before the collision.

Based on these facts Bright Bay is indistinguishable.  Because Bridges operated the

van with permission earlier in the day, he was initially covered by the policy and only

"became 'uncovered' upon the happening of a subsequent event" – his use of the car without

permission.  Bright Bay, 75 N.Y.2d at 401 (citation omitted).  Since Bridges and his use of the

van was covered throughout the day while using the van with permission, this was not a case

where there "was never a policy in effect covering the involved automobile" like in Zappone.

Bright Bay, 75 N.Y.2d at 401.  The instant case is also factually similar to Clark because the

definition of an insured is nearly identical in both cases.  205 A.D.2d 857.  In Clark, an

insured was defined as follows:

> 1.      WHO IS AN INSURED
> The following are 'insureds'.  (a) you for any covered "auto".  (b) anyone
> else while using with your permission a covered 'auto' you, own, hire or borrow .
> . .

See Flink Reply Affirm., Ex. 27, Dkt. No. 20-3, 116.  As noted above, the General Star policy

defined an insured as:

> SECTION III
> Who Is An Insured . . .
> 3.      With respect to any (i) auto, or (ii) mobile equipment,
> provided such mobile equipment is registered in your name
> under any motor vehicle registration law; any person is an
> insured while driving such auto or mobile equipment with
> your permission.

See Flink Affirm., Ex. 6, 12-13.  The Clark Court determined that the permissive use requirement, although though not specifically denominated as such, was an exclusion requiring a notice of disclaimer.  205 A.D.2d at 858.

Further, Zappone and Blakely Pumping are distinguishable.  In Zappone, the policies in question could have never extended coverage to the driver because he was not a named insured in either policy and was not driving one of the covered automobiles.  By contrast, the General Star policy covered Bridges as an employee while driving the van with permission.  It was only when he drove the van without permission that he was excluded from coverage.  In reaching its conclusion, the Zappone Court posed several different scenarios in which an insurer may deny liability.  55 N.Y.2d at 136.  Notably, the court considered when a carrier "may deny liability because although the person and the vehicle are covered by the policy the circumstances of the accident bring a policy exclusion into play, for example, that the person . . . was injured while an automobile insured as a pleasure vehicle was being used as a public conveyance."  Id.  In this situation, "the policy covers the driver and the vehicle and the accident would be covered except for the specific policy exclusion and the carrier must deny coverage on the basis of the exclusion."  Id.  Under that scenario, there is no coverage "by reason of exclusion" and a notice of disclaimer is required.  Id. at 137.  Similarly, the General Star policy covered Bridges and the van and the collision would have been covered except for the policy exclusion for an insured operating the vehicle without permission.  Like the scenario posed by the Zappone Court, Bridges was not covered under the General Star policy by reason of exclusion and a notice of disclaimer was required.

In Blakely Pumping, the insured urged the Second Circuit to adopt the Clark Court's finding that definitional language constituted a policy exclusion requiring a notice of

disclaimer.  593 F.3d at 154.  The Second Circuit distinguished Clark on the basis that Clark "dealt with an insurance policy that explicitly covered the auto and its driver in many other circumstances" which is a critical distinction.  Blakely Pumping, 593 F.3d at 154 (citing Clark, 205 A.D.2d at 858).

Likewise, in Prudential Property & Casualty Insurance Co. v. Hobson, an endorsement to the policy at issue defined a "hit-and-run automobile" as one requiring "physical contact." 67 N.Y.2d 19 (1986).  In that case, the court concluded that the endorsement could not have covered the no-contact injury alleged since, by definition, the coverage existed only when there is physical contact.  Id. at 21.  The requirement of "physical contact" was a matter of coverage, not an exclusion from coverage, and a notice of disclaimer was not required.  Id.

General Star's denial of coverage to Bridges was due to his use of the van without permission, and based on a policy exclusion rather than a lack of inclusion.  Because the permissive use requirement operated as a policy exclusion, a disclaimer was necessary pursuant to section 3420(d)(2).

### 4.  Compliance with Section 3420(d)(2)

Section 3420(d)(2) mandates that an insurer provide a written disclaimer as soon as is reasonably possible to the insured and the injured person or any other claimant.  The notice requirement applies not only to a primary insurer, but to a disclaimer of excess coverage as well.  Zappone, 55 N.Y.2d at 135.  As previously noted, the failure to do so precludes an effective disclaimer.  See Cnty. of Nassau, 46 N.Y.2d at 1029.  Since the permissive use provision in the General Star policy excluded Bridges from coverage, General Star was obligated to timely serve a disclaimer in compliance with section 3420(d)(2) on Bridges, the insured, and plaintiff, the injured claimant.

### a. Lack of Disclaimer

General Star, consistent with its position that a disclaimer was not required, contends that it never issued a disclaimer to Bridges or to plaintiff.  Defendant insists that its February 25, 2004, letter to Bridges was not a disclaimer and instead merely advised Bridges that there was no coverage for his collision with Britt.  Assuming that the February 25, 2004, letter was not a disclaimer, and in the absence of any other disclaimer, defendant failed to serve a written notice of disclaimer as required by section 3420(d)(2).  Accordingly, General Star is precluded from now asserting defenses to coverage including non-permissive use.

### b. February 25, 2004, Letter as Disclaimer

Plaintiff contends that General Star's February 25, 2004, letter to Bridges constitutes a written notice of disclaimer.  Notably, the February 25, 2004, letter to Bridges stated:

> Accordingly, General Star must respectfully decline coverage for this loss under the above-referenced policy, and will not be responsible for indemnification and/or defense fees for you associated with this action.  Any further action taken by or on behalf of General Star shall not be construed as a waiver of any of its rights under this policy.  General Star reserves its rights to supplement and/or amend this disclaimer.[14]

See Flink Affirm., Ex. 9 (emphasis added).  Assuming that the February 25, 2004, letter to Bridges is a disclaimer, contrary to General Star's position, it must have complied with section 3420(d)(2) to be effective.  Under that section, a disclaimer must be served: 1) in

---

[14] Despite this specific language, the purpose of General Star now claiming that the letter was not a disclaimer is clear.  If it was a disclaimer letter it would be an acknowledgment by General Star that a disclaimer was required.  This, in turn, would completely undermine its argument that a disclaimer was not required because there was no coverage.

If the letter was timely served upon plaintiff, the injured party, in compliance with section 3420(d)(2) there is little doubt that General Star would now be asserting that the letter was a disclaimer.

Apparently General Star realized that it could not have it both ways and decided that the "no coverage" defense gave it the best chance to avoid liability.  Thus it became a notice letter and not "this disclaimer" letter.

writing; 2) as soon as is reasonably possible; and 3) on the insured and the injured person or any other claimant.

The letter satisfies the first requirement that the notice of disclaimer be in writing.  In assessing the second requirement of timeliness, the reasonableness of any delay in disclaiming is measured "from the point in time when the insurer first learns of the grounds for disclaimer of liability or denial of coverage."  U.S. Underwriters Ins. Co. v. City Club Hotel, LLC, 369 F.3d 102, 107 (2d Cir. 2004) (quoting In re Allcity Ins. Co. & Jimenez, 78 N.Y.2d 1054, 1056 (1991)).  When the grounds for disclaimer are not readily apparent to the insurer, an insurer is provided a reasonable amount of time to investigate the claim to decide whether to disclaim or not.  City Club Hotel, 369 F.3d at 107.  Finally, an insurer who delays in sending a written notice of disclaimer bears the burden of justifying its delay.  Id. (citing First Fin. Ins. Co. v. Jetco Contracting Corp., 1 N.Y.3d 64, 69 (2003)).

Defendant contends that because the General Star policy was an umbrella policy, any potential duty to disclaim did not arise until a reasonable time after the primary insurance coverage was exhausted and the retained limit met.  See Barber v. RLI Ins. Co., No. 1:06-CV-630, 2008 WL 5423106 (N.D.N.Y. Dec. 24, 2008) (Scullin, J.) (holding excess insurer's duty to disclaim arises at the time of exhaustion of primary insurance); Allcity Ins. Co. v. Sioukas, 51 A.D.2d 525 (N.Y. App. Div. 1st Dep't 1976) (finding that excess policy did not afford coverage until primary coverage was exhausted and thus excess carrier had no duty to disclaim).

Barber involved if and when the excess carrier had a duty to defend and indemnify the insured.  In that case, the excess carrier was not obligated to defend the insured because the primary insurer retained the duty to defend.  This was so despite the tender of the policy limit

to the excess insurer because the contract unambiguously established that defense costs were in addition to the policy limit.  The umbrella policy at issue provided coverage "for amounts for which the insureds become[ ] legally liable in excess of the primary policies."  Barber, 2008 WL 5423106, at *3 (citation omitted).  Because the primary insurer had a duty to defend, the primary insurance had not yet been exhausted and the excess carrier had no duty to send a notice of disclaimer.  Sioukas involved a disclaimer based on the failure of the insured to timely place the primary insurer on notice.  Because the underlying primary policy in that case was not exhausted due to the insured's failure to timely notify the primary insurer, the excess insurer was not required to disclaim coverage since the excess coverage was never triggered.

Barber and Sioukas are distinguishable on the bases for denying coverage; here, General Star disclaimed coverage based on a policy exclusion and there were no issues involving The Hartford's duty to defend or failure to receive notice.  The general rule remains that an insurer, both primary and excess, is obligated to give a written notice of disclaimer as soon as reasonably possible.  See Reyes v. Diamond State Ins. Co., 35 A.D.3d 830, 831 (N.Y. App. Div. 2d Dep't 2006) ("An insurer must give written notice of a disclaimer of coverage as soon as is reasonably possible after it first learns of the accident or of grounds for disclaimer . . . [and] applies not only to an insurer's disclaimer of primary insurance coverage, but to a disclaimer of excess coverage as well.") (internal quotations and citations omitted); see also Mann v. Gulf Ins. Co., 3 A.D.3d 554, 556 (N.Y App. Div. 2d Dep't 2004).  The Second Circuit recently cited this principle with approval in General Star National Insurance Co. v. Universal Fabricators, Inc., 585 F.3d 662, 674 (2d Cir. 2009).  The court

there noted that the excess carrier was required to disclaim pursuant to section 3420(d)(2) as soon as reasonably possible.  Id.

Accordingly, in determining whether the February 25, 2004, letter was served as soon as reasonably possible, any delay must be measured from when General Star first learned of the grounds for its disclaimer of liability or denial of coverage.  General Star was in receipt of the underlying summons and complaint in the personal injury action on November 27, 2002.  General Star received The Hartford's disclaimer letter based on non-permissive use on December 2, 2003.  December 2, 2003, was the latest possible day on which General Star could have learned of the non-permissive use provision–the basis for its disclaimer of liability.  The reasonableness of General Star's delay in serving a disclaimer must be measured from December 2, 2003.

Whether a disclaimer under section 3420(d)(2) is timely is generally a question of fact.  Continental Cas. Co. v. Stradford, 11 N.Y.3d 443, 449 (2008).  However, in "exceptional" cases that "present extreme circumstances," the reasonableness of the delay may be decided as a matter of law.  Stradford, 11 N.Y.3d at 449.  The New York Court of Appeals has concluded that an unexcused delay of 48 days or longer is unreasonable as a matter of law.  Jetco Contracting, 1 N.Y.3d at 70; see also Cnty. of Nassau, 46 N.Y.2d at 1029 (finding unexplained two month delay unreasonable as a matter of law).

Despite receiving The Hartford's disclaimer letter on December 2, 2003, General Star did not serve a disclaimer letter until February 25, 2004.  It's February 25, 2004, letter was served 455 days after it first learned of the Britt's personal injury action against Pharmacologic and Bridges, and 85 days after it became aware of the grounds for

disclaimer.  Defendant has provided no explanation for its delay.  Based on New York case law, an unexplained delay of 85 days is unreasonable as a matter of law.

Further, section 3420(d)(2) requires the disclaimer be served on "the insured and the injured person or any other claimant."  § 3420(d)(2).  General Star does not dispute the requirement to serve the disclaimer on Britt, the injured person.  Plaintiff submitted an affidavit stating that he never received a disclaimer from General Star.  See Britt Aff., Dkt. No. 15-2, ¶ 2.  There is no evidence that General Star served the letter on plaintiff or his attorneys, Flink Smith LLC.

Therefore, even construing the February 25, 2004, letter as a written notice of disclaimer, General Star did not comply with section 3420(d)(2) because its disclaimer was unreasonably delayed and never served on Britt, the injured person.  Because the February 25, 2004, disclaimer to Bridges was insufficient under section 3420(d)(2), General Star is precluded from relying on defenses to coverage including non-permissive use.

## IV.  CONCLUSION

Britt demonstrated his prima facie entitlement to summary judgment and defendant failed to raise a triable issue of fact in opposition.  At the outset, the 50-B judgment against Bridges is enforceable and General Star may not now collaterally attack a validly obtained state court judgment.  Contrary to defendant's argument, The Hartford policy's retained limit of $500,000 was exhausted by settlement payment to plaintiff and thus the General Star umbrella policy was triggered.  Because the St. Paul CGL policy was not applicable to a claim for automobile liability, it did not need to be exhausted prior to General Star's obligation to drop down and provide coverage for the 50-B judgment rendered against Bridges for his

negligent use of the van.  Even if this were a valid defense, General Star never disclaimed coverage on this basis and it is too late to now issue a disclaimer.

Next, plaintiff established that Bridges fell within the General Star policy, but for his use of the van without permission.  Accordingly, the permissive use requirement was a policy exclusion.  Because this language operated as an exclusion, New York Insurance Law section 3420 applies and General Star was obligated to serve a written notice of disclaimer in compliance with section 3420(d)(2).

General Star maintains that its February 25, 2004, letter was not a disclaimer, despite specific language to the contrary, and provides no evidence of any other written notice that could serve as a disclaimer.  In the absence of a written disclaimer, defendant failed to comply with section 3420(d)(2) and is precluded from relying on defenses to coverage.

Alternatively, even if construed as a notice of disclaimer, the February 25, 2004, letter is ineffective.  General Star was not entitled to wait until the plaintiff's primary coverage through The Hartford was exhausted before disclaiming.  Instead, the reasonableness of the delay ran from when General Star first learned of its grounds for disclaiming.  That occurred on December 2, 2003, when General Star received a copy of The Hartford's disclaimer letter citing non-permissive use.  General Star did not "disclaim" to Bridges for 85 days and offered no excuse for this unreasonable delay.  Further, defendant did not serve the "disclaimer" on plaintiff, the injured party, although required to do so.

Because General Star failed to comply with section 3420(d)(2), it is precluded from now disclaiming coverage based on non-permissive use.  Accordingly, plaintiff's motion for summary judgment declaring that General Star is obligated to provide coverage will be granted.

Therefore, it is

ORDERED that

1.  Plaintiff Andrew Britt's motion for summary judgment is GRANTED;

2.  Defendant General Star Indemnity Company's cross-claim is DISMISSED; and

3.  General Star Indemnity Company shall pay the amount of $2,402,962.45 to plaintiff Andrew Britt plus interest from November 17, 2009.

The Clerk of the Court is directed to enter judgment in favor of the plaintiff Andrew Britt and against the defendant General Star Indemnity Company in the sum of $2,402,962.45 plus interest from November 17, 2009.

IT IS SO ORDERED.

_____
United States District Judge

Dated: April 4, 2011
        Utica, New York.